IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **Thomas W. Scott, Jr.**<br>3177 Ashwood Road<br>Cleveland, Ohio 44120<br><br>and<br><br>**Joyce Scott**<br>3177 Ashwood Road<br>Cleveland, Ohio 44120<br><br>   Plaintiffs,<br><br>     vs.<br><br>**Select Portfolio Servicing, Inc.**<br>c/o CSC-Lawyers Incorporating Service<br>50 W. Broad Street, Suite 1800<br>Columbus, OH 43215<br><br>   Defendant. | CASE NO.<br><br>JUDGE<br><br><br><br>**COMPLAINT**<br><br>**With Jury Demand Endorsed Hereon** |

Now come Plaintiffs, Thomas W. Scott, Jr., and Joyce Scott, by and through counsel, and state as follows for their Complaint against the Defendant Select Portfolio Servicing, Inc.:

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiffs Thomas W. Scott, Jr., and Joyce Scott, ("Plaintiffs" or the "Scotts") are the owners of residential real property, a single family home and their personal residence, located at and commonly known as 3177 Ashwood Road,

Cleveland, Ohio 44120 (the "Property"). For the purposes of this Complaint, "Plaintiffs" includes counsel for the Plaintiffs, The Dann Law Firm, and counsel's paralegals and support staff.

2.     Defendant Select Portfolio Servicing, Inc. (hereinafter "Defendant" or "SPS") is a foreign company incorporated and headquartered the state of Utah and licensed to do business in Ohio. SPS is a mortgage servicer specializing in the servicing of single-family residential mortgages. According to the SPS website, "As a servicer, SPS manages the day-to-day administration of mortgage accounts. SPS's overall objective is to provide excellent service to customers, preserve homeownership and prevent foreclosure."

3.     SPS provides collection and management services on the Plaintiffs' Note and Mortgage (collectively referred to hereinafter as the "Loan") for the Property, on behalf of Springleaf Financial Services, Inc. ("Springleaf") which is, or was, the owner and/or assignee of the Loan. Since October 1, 2014, SPS has been authorized by Springleaf to collect monthly payments on the Loan from the Plaintiffs and then allocate and distribute those payments to Springleaf.  EXHIBIT C.

4.     SPS's role in pursuing the Plaintiffs to collect on the Loan meets both the definition of "Servicing" contained in 12 C.F.R. §1024.02 and 12 U.S.C. §2605(i)(3), and the definition of a "Debt Collector" contained in 15 U.S.C. §1692a(6).

5.     The Scotts are "Persons" and "Consumers;" and SPS is a "Supplier" and the mortgage servicing functions performed by SPS are qualifying "Consumer

Transactions" under the Ohio Consumer Sales Practices Act, R.C. §1345.01, *et seq.*

6.     This Court has jurisdiction pursuant to 28 U.S.C. §1331 as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act (DFA), the Real Estate Settlement Procedures Act, 12 U.S.C. §§2601, et seq. (RESPA) and the Truth in Lending Act, 12 U.S.C. §1640(e) (TILA). This action is filed to enforce regulations promulgated by the Consumer Financial Protection Bureau (CFPB) that became effective on January 10, 2014, specifically, 12 C.F.R. §§1024.1, et seq. of Regulation X and 12 C.F.R. §§1026.1 et seq. of Regulation Z .

7.     This Court has supplemental jurisdiction to hear any and all state law claims that are pleaded herein or that may subsequently arise pursuant to 28 U.S.C. §1367.

8.     Venue lies in this District pursuant to 28 U.S.C. §1391(b), as the Plaintiffs reside and the Property is located in Cuyahoga County, Ohio, in the Northern District of Ohio, Eastern Division.

9.     Defendant is both a "debt collector" engaged in the regular collection of debts owed to another from "consumers" as those terms are defined in 15 U.S.C. §1692a(6) and (3), respectively. SPS is not exempted from the FDCPA by virtue of being a mortgage servicer because SPS assumed the servicing of Plaintiffs' Loan after it was in default. (See: 15 U.S.C. §1692a(6)(F)(iii))  (EXHIBIT C)

10.    The Plaintiffs are "consumers" as that term is defined in 15 U.S.C. §1692a(3).

11.    The TILA-related transactions herein complained of are of a "closed-end consumer credit transaction secured by a dwelling," as defined in 12 C.F.R. §1026.36(b).

## INTRODUCTION

12.    The Plaintiffs restate and incorporate all statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

13.    This case is brought under 12 U.S.C. §§2401.1, et seq. (RESPA) and 12 U.S.C. §§2601.1, et seq. (TILA) and concerns numerous, material errors that the Defendant made in accounting for and servicing Plaintiffs' mortgage Loan. These mistakes occurred subsequent to the transfer of the servicing of the Plaintiffs' Loan to SPS in October of 2014 and include:

a) The Defendant's failure to properly process a Home Affordable Modification Agreement, where SPS offered and accepted payments on a three month "Trial Modification" but then quadrupled the interest rate on the subsequently offered alleged "Permanent Modification." SPS failed and refused to explain why they hiked the interest rate or correct that mistake notwithstanding the Plaintiff's repeated efforts to obtain an explanation or correction;

b) Breach of contract with the Plaintiffs that violated SPS's contractual obligations and duty of good faith and fair dealing with the Plaintiffs;

c) Promissory Estoppel by dishonoring reasonably relied upon representations from SPS concerning the eventual Permanent Modification's terms;

4

d) Failure to properly credit and administer Plaintiffs' escrow account, without just cause;

e) Repeated attempts to inflate the Plaintiffs' escrow account payments without just cause by purchasing very high priced and duplicative homeowners insurance and miscalculating other charges.;

f) Violations of numerous provisions of the new RESPA and TILA mortgage servicing regulations (12 C.F.R. §§1024.1, et seq. and 12 C.F.R. §§1026.1, et seq.) by failing to respond, or timely respond, to properly submitted Requests for Information (RFI) and Notices of Error (NOE) entitling the Plaintiffs to recover their actual damages, statutory damages, and attorney fees;

g) Withholding and converting the Plaintiffs' monthly mortgage principal and interest and escrow account over-payments;

h) Violation the Fair Debt Collection Practices Act (FDCPA) by misrepresenting the proper amount and type of Loan obligation SPS was attempting to collect, and by repeatedly notifying Plaintiffs that they are delinquent and in default on the Loan, when in fact, any alleged arrearage was solely due to the Defendant's own errors;

i) Repeated direct contact with, and attempted direct contact with, the Plaintiffs notwithstanding  three (3) "cease and desist" demands delivered to SPS by the Scotts' counsel all in derogation of the FDCPA;

j) Slander of the Plaintiffs to their insurance provider as "delinquent on their mortgage and in trouble" which was false and embarrassing to the Plaintiffs.

k) Defendant's conduct towards the Plaintiffs also violated numerous provisions of  Ohio's Consumer Sales Practices Act;

The Defendant's actions towards the Plaintiffs are material violations of numerous sections of the new RESPA and TILA servicing regulations and the FDCPA and the Ohio Consumer Sales Practices Act (OCSPA) and has caused them significant economic and non-economic damages as will appear more fully below.

## OPERATIVE FACTS

14.    On or about September 25, 1998, Plaintiffs entered into a fixed rate 11.25% (12.26% APR) subprime mortgage Loan agreement for $93,373.16 with American General Finance, Inc. and executed a Note and Mortgage Agreement as evidence of said Loan. The Mortgage secured the Plaintiffs' residence located at 3177 Ashwood Road, Cleveland, Ohio 44120 (the "Property") (EXHIBITS A & B).

15.    At all times relevant herein Defendant SPS was the servicer of the Plaintiffs' Loan.  However, prior to assuming the servicing role with the Scotts' Loan, the previous servicer, Springleaf Financial of Ohio , Inc., entered into a Loan Modification with the Scotts which agreement was recorded with the Cuyahoga County Recorder (AFN 201202070260) and in effect at the time the Scotts fell behind on their payments thereunder.  (EXHIBIT D)

16.    At the time that SPS started servicing this Loan on October 1, 2014 the Scotts were in default (EXHIBIT C)  under the terms of the "Loan Modification Agreement" entered into in 2012 with the owner and previous servicer of the Loan, Springleaf Financial Services of Ohio, Inc. (EXHIBIT D).

17.    Plaintiffs began suffering a series of family emergencies and financial problems in late 2013 and 2014 impairing their capacity to meet all of their obligations. Plaintiffs fell behind in their mortgage payments under the 2012 Loan Modification.

18.     The Scotts applied for another Loan Modification with SPS in late 2014 and early 2015. On March 18, 2015, the Plaintiffs were offered a HAMP Tier One Trial Modification that dropped their interest rate to 2%, for at least 5 years, and lowered their monthly payments of principal, interest and escrow to $932.31 (a savings of approximately $270 per month over the 2012 Loan Modification). (EXHIBITS E 1-4, the "Trial Modification Agreement").

19.     The Plaintiffs received the four-parts of the Trial Modification Agreement ("Trial Mod") in the same envelope or in separate envelopes delivered on the same day.  It consists of a three (3) page cover letter EXHIBIT E-1; a two (2) page agreement letter, also dated March 18, 2015, EXHIBIT E-2; a five (5) page "NPV Data Input Field Values (HAMP)" matrix outlining the Trial Modification inputs, interest rate, term and starting Loan balance, EXHIBIT E-3; and a three (3) page document of Frequently Asked Questions (FAQ), EXHIBIT E-4.

20.     The agreement letter (EXHIBIT E-2) set the Trial payment at $932.31 to cover interest, principal, taxes and insurance and required Plaintiffs to pay that amount for each of the following three months (May, June and July). The agreement letter said (in relevant part): "This is the first step toward qualifying for more affordable mortgage payments . . . . After all Trial payments are timely made and you have submitted all the required documents, your mortgage will be permanently modified."

7

21. Other parts of the EXHIBIT E packet explained how the Trial Modification payments were calculated. The "NPV Data Input Field Values (HAMP)" matrix, (EXHIBIT E-3) also explained what might change on the Permanent Modification, when offered. The FAQ enclosure (EXHIBIT E-4) explained that, by design, the Permanent Modification monthly payment might increase, but not substantially: "Any difference between the amount of the Trial period payments and your regular mortgage payments will be added to the balance of your account along with any other past due amounts as permitted by your mortgage documents. While this will increase the total amount that you owe, *it should not significantly change the amount of your modified mortgage payment* as that is determined based upon your gross monthly income, not your account balance." Emphasis added. (EXHIBIT E-4).

22. Included in the March 18, 2015 Trial Modification packet was a document titled "NPV Data Input Field Values (HAMP)," a five page matrix, required to be disclosed to the Scotts under the federal regulations governing the HAMP program. (EXHIBIT E-3). "NPV" stands for Net Present Value and the matrix document listed the various figures and calculations used determine the net present value of the Loan and to arrive at the decision to offer the Scotts a Loan Modification. At the bottom of the fourth page of the five page matrix, (Item 33) and at the top of the fifth page of the matrix (Item 34) SPS disclosed that it used a starting interest rate of 2% and a amortization term of 268 months to calculate the lowered monthly payment.

8

23.   Items 33 and 34 of the matrix (EXHIBIT E-3) disclosed the following information:

| Input Data Fields | Explanation | Value used in NPV calculation |
|---|---|---|
| 33. Interest rate for the Proposed HAMP Tier 1 Modification | This field identifies the starting interest rate of the proposed HAMP Tier 1 modified mortgage. This rate is fixed for at least the first 5 years after Modification. | 2.000% |
| 34. Amortizing Term of the Proposed HAMP Tier 1 Modification | This field identifies the number of months left to pay the proposed HAMP Tier 1 modified mortgage. | 268 |

Therefore, according to the terms as represented by SPS to the Plaintiffs in the March 18, 2015 Trial Modification offer, the principal and interest portion of their payment would drop and remain at $452.63 per month *for at least 5 years*. Combined with a 268 month amortization period the modified interest and principal payment dropped from $981.04, a savings to the Scotts of $528.41 per month less than the principal and interest rate of the 2012 Loan Modification. (EXHIBIT D)

24.   The Scotts made the three Trial Modification payments in a timely manner, thereby qualifying for a Permanent Modification.

25.   On or about July 15, 2015 the Scotts received the (Permanent) proposed "Home Affordable Modification Agreement" outlining the terms of their modified Loan, effective August 1, 2015. (EXHIBIT F-3) The Permanent Loan Modification was

accompanied by a cover letter and "Summary of your modified mortgage." (EXHIBITS F-1 & F-2, the "Permanent Modification"). However, the terms of the Permanent Modification were radically different than the terms of the Trial Modification, in three material respects: the Loan balance, the term and the interest rate.

26.　The least significant change was the lower Loan balance used in the Trial Modification of $96,710.52. (Item 28 on the NPV Matrix, EXHIBIT E-3) Four months later when the Permanent Modification was offered, the Loan balance increased to $99,620.80. More importantly, the term of the Trial Modification was 268 months, but the term of the Permanent Modification was only 195 months, six (6) years less than the Trial Modification payback period.  The third difference was that the Permanent Modification raised the interest rate over four-fold from 2% to 8.625% (EXHIBIT F-3). The increased Loan balance, reduced term and higher interest rate had the effect of raising the principal and interest portion of the monthly payment from $432.63 for the Trial Modification to $949.24 for the Permanent Modification an increase of $496.61 per month.

27.　The Plaintiffs called SPS on numerous occasions and challenged the different terms of the Permanent Modification, but received no satisfaction. On or about July 27, 2015, Joyce Scott told SPS Relationship Representative "Lisa" that they would be appealing the Permanent Modification. Mrs. Scott was told by Lisa that if the Scotts appealed the Modification they would not get another one, and suggested maybe the house should be "liquidated."

28.     In late July or early August of 2015, the Plaintiffs sent a complaint letter to the Consumer Financial Protection Bureau (CFPB) which complaint was then forwarded to SPS. Said letter, a portion of which is attached hereto as EXHIBIT G was legally equivalent to a Qualified Written Request or Request for Information, under the RESPA and TILA Regulations. On or about August 7, 2015, SPS responded to the complaint (EXHIBIT H), but did not respond as to why there was a fourfold increase in the interest rate from the Trial to the Permanent Modification. However, in response to an escrow issue (a disputed matter in addition to the Permanent Modification problem) SPS acknowledged that they had new "updated" escrow information, but threatened to withhold a revised escrow accounting until *after* the Scotts accepted the new, more expensive Modification.

29.     The Scotts again challenged the Permanent Modification through the CFPB, but were again rebuffed by SPS, which was now threatening to foreclose on the house unless the Scotts accepted the much more expensive Permanent Modification. (EXHIBIT I). Under duress and coercion from the threat of foreclosure the Scotts executed the Permanent Modification and started paying the increased mortgage payments, all under protest.

## THE ESCROW ACCOUNT

30.     In addition to the dispute about the Permanent Modifications monthly payment, the Scotts discovered that SPS had been substantially overcharging them on their mortgage escrow account as Defendant either overpaid for a single homeowners

policy; or put forced placed insurance on the property when it was already fully insured; or actually kept two redundant insurance policies in effect paying for them with funds from the escrow account.

31.     Defendant SPS began servicing the Scotts' Loan on October 1, 2014. EXHIBIT D. Among other duties performed by servicers in "boarding" a new loan, is to transfer the escrow account on a Loan from the prior servicer into its own escrow accounting system.  This requires coordinating the starting balance, and assuring that the tax and insurance payments stay in sync with the previous servicer's escrow administration.   The most recent escrow analysis performed by Springleaf Financial was conducted in April of 2014 and the homeowners insurance for the Scotts' house from the prior year cost $902.96 (EXHIBIT J-1)

32.     During the process of transferring the file from the previous servicer, Springleaf Financial, to SPS the Defendant changed the projected annual homeowners insurance for the Scotts, claiming that the homeowners insurance alone would cost $3,499.80. The new projected escrow amounts were part of the Defendant's initial escrow analysis performed on November 26, 2014.  (EXHIBIT J-2)

33.     The effect of incorrectly projecting the homeowners insurance to be so inexplicably expensive was two-fold.  First, the new monthly payment on the SPS-administered Loan suddenly had an additional $301.52 added onto the Scotts' total payment, effective January of 2015. Second, the initial escrow analysis was so inflated that it caused a shortage to the Scotts' escrow account of $3,019.23.  (EXHIBIT J-2)

12

34.    As explained in the new SPS escrow analysis, the shortage was due immediately, or could be made up with an additional $125.80 added to the Scotts' monthly payment for 24 months.   The final result of this escrow mistake was to increase the Scotts' monthly payment by $301.12 plus $125.80 to make up for the alleged escrow shortage.   Therefore, even though SPS was on notice of the Scotts' financial difficulties (the Loan was in default when SPS started servicing in October of 2014) SPS "spontaneously" raised the Scotts' total monthly payment by $426.92, or 33% higher than the Springleaf Loan Modification payment then in effect.  (EXHIBIT J-2)

35.    On or about March 30, 2015, SPS sent out a new escrow analysis and reduced the projected insurance cost from $3,499.80 back down to $1,011.84. (EXHIBIT J-3)  The new, greatly reduced, escrow payment was supposed to drop from $592.77 down to $272.35, but the lowered escrow payment wouldn't go into effect until May 1, 2015. (EXHIBIT J-3) Further, the new escrow analysis showed that the Scotts now had an escrow surplus of $820.32 which was promised to the Scotts "under separate cover." The Scotts never received that shortage check. SPS violated 12 CFR 1027.17(c)(7) when it hiked the insurance cost projection by 240%, as will appear more fully below.  (EXHIBIT J-3)

36.    Notwithstanding this extreme error in handling the Scotts' escrow account, the Defendant failed to refund the overcharges to the Plaintiffs claiming that the Scotts were in arrears on their monthly mortgage payments stemming from their

still unresolved and still unexplained dispute with the hike in the principal and interest terms of the Permanent Modification.

37.     Finally, even though the March 30, 2015 escrow analysis indicated that the taxes and insurance portion of the payment each month (beginning in May of 2015) would drop to $272.35, in fact, the escrow portion rose back to $487.67. (EXHIBIT J-4) No escrow analysis was done (or shared with the Scotts) to "rescind" the $272.35 escrow payment promised effective May 1, 2015. Plaintiffs have had their escrow account manipulated and artificially inflated ever since the Scotts' Loan was transferred to SPS for servicing.

38.     Further, in an evident attempt to gather information to clear up the insurance overcharges, a representative of SPS called the Plaintiffs' own local insurance agency and, in the course of explaining the kind of information and/or confirmation that SPS was seeking, gratuitously told the insurance provider's staff member that the Scotts were two months behind on their mortgage and could lose their home to foreclosure. The statement was untrue and made without privilege, causing the Plaintiffs embarrassment and shame.

39.     Plaintiffs have continued to seek an explanation from Defendant of why they are not entitled to the Permanent Modification that was agreed to when they accepted the Trial Modification in March of 2015. Plaintiffs, by and through their attorneys, the Dann Law Firm, have used the new RESPA and TILA regulations to pursue information from, and document errors committed by, SPS in servicing the

Scotts' Loan, as will appear more fully below.

40.    To date the Scotts have paid SPS over $6,000 more than they would have, had SPS not breached the agreement between the parties and violated the servicing regulations.

41.    SPS has continued to report the Scotts as being in default on the mortgage and as a direct and proximate result of the failure of SPS to bring their delinquency to an end by entering into a promised Permanent Loan Modification agreement, the Scotts have been denied credit, faced increased insurance costs and suffered from a reduction in their credit score.  The Scotts have had to retain counsel to prepare and file Notices or Error and Requests for additional information (after the response to their initial requests for information were inadequate). The Scotts also incurred the cost of postage, paper and copy costs related to those requests.

42.    The conduct of SPS has also directly and proximately caused the Scotts to suffer from emotional distress which manifested itself in psychological and physical conditions and has caused stress in their marriage.

## RESPA REGULATIONS

43.    In January 2013, the Consumer Financial Protection Bureau (hereinafter "CFPB") issued a number of final rules concerning mortgage markets in the United States, pursuant to the Dodd Frank Act, Public Law No. 111-203, 124 Stat. 1376 (2010). Specifically, on January 17, 2013, the CFPB issued the Real Estate

Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z) Mortgage Servicing Final Rules, 78 F.R. 10901 (Regulation Z) (February 14, 2013) and 78 F.R. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

44.    The Plaintiffs' Loan is a "federally related mortgage Loan" as said term is defined by 12 C.F.R. §1024.2(b).

45.    Defendant is subject to the aforesaid Regulations and does not qualify for the exception for "small servicers" as defined in 12 C.F.R. §1026.41(e)(4) or the exemption for a "qualified lender" as defined in 12 C.F.R. §617.700.

46.    Plaintiffs are asserting claims for relief against Defendant for breach of the specific RESPA rules under Regulation X as set forth below; and for violations of TILA including violation of 12 U.S.C §1641(f)(2); 12 C.F.R. §1026.41 and 12 U.S.C. §2605(e); and the provisions and case law rulings thereunder.

47.    Plaintiffs have a private right of action for the claimed breaches under both TILA and RESPA pursuant to 12 U.S.C. §2605(f) and such actions provide for remedies including actual damages, statutory damages, and recovery of Plaintiffs' attorneys' fees.

48.    At the time of the filing of this Complaint the Defendant had more than 1,200 consumer complaints lodged against them concerning problems with their "Loan servicing, payments, escrow account;" and over 3,500 consumer complaints lodged

16

against them concerning the "Loan Modification, collection, foreclosure" of the mortgage Loans they service. Each such complaint is filed and cataloged in the Consumer Financial Protection Bureau's publicly accessible online database. http://www.consumerfinance.gov/complaintdatabase/ .

49.     Defendant's conduct and delays in this case are contrary to the policies stated in 12 C.F.R. §1024.38, and are consistent with Defendant's continuing poor mortgage servicing practices and non-compliance with the RESPA and TILA regulations contained in 12 C.F.R. §§1024.1, *et seq.*; and 12 C.F.R. §§1026.1, *et seq.* Defendant's conduct is part of a pattern and practice and, pursuant to 12 USC §2605 (f)(1)(B), the Plaintiffs are entitled to statutory penalties for each and every violation of the regulations contained in and pursuant to12 C.F.R. §1024.35 and 12 C.F.R. §1024.36, 12 C.F.R. §1024.41, 12 C.F.R. §1024.17 and 12 U.S.C. §2605(e).

## COUNT ONE
## BREACH OF CONTRACT

50.     Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

51.     The Plaintiffs fell behind in their mortgage payments in 2014 and requested that they be reviewed for a modified mortgage payment. The Scotts sent their completed application for loss mitigation evaluation to the Defendant and were approved for a HAMP Tier 1 Loan Modification by letter and enclosures from the Defendant, dated March 18, 2015.

17

52.    Defendant's March 18, 2015 letter and enclosures (EXHIBITS E-1 through E-4), offering a HAMP Tier 1, Trial Loan Modification, was a conditional contract offer to the Scotts to accept and thereby form, a Permanent, modified, and binding Loan contract. By the terms of the offer, if the Scotts accepted the offer and complied with the terms and conditions of making three timely Trial Modification payments, SPS would enter into a Permanent Loan Modification with the Scotts for at least five years with terms similar in all material respects to the terms of the Trial Loan Modification Offer. The Scotts complied with the terms and conditions set out in Plaintiff's offer in the March 18, 2015 letter and thereby accepted the offer and upon making three timely monthly payments, completed the formation of a binding contract with the Defendant.

53.    Exhibit E-2 is a two page agreement letter that set the payment amount and due dates for the three months of Trial payments required from the Scotts. The agreement letter went on to state: "This is the first step toward qualifying for more affordable mortgage payments . . . . After all Trial payments are timely made and you have submitted all the required documents, your mortgage will be permanently modified."

54.    The Scotts made all the Trial monthly payments in a timely manner and otherwise complied with the Trial Plan's terms and conditions.

55.    Exhibit E-3 was a five page "NPV Data Input Field Values (HAMP)" matrix that outlined the data inputs used by SPS to create the Trial Loan

Modification offer and explained how those terms might differ in the final Permanent Loan Modification. At the bottom of the fourth page of the five page matrix (Item 33), and at the top of the fifth page of the matrix (Item 34), SPS disclosed that it used a starting interest rate of 2% and a amortization term of 268 months to calculate the lowered monthly payment.

56.    Item 33 of the NPV matrix (Exhibit E-3) indicated that the starting interest rate used in the Modification Plan was 2%. The "Explanation" of Item 33, indicated as follows: "This field identifies the starting interest rate of the proposed HAMP Tier 1 modified mortgage. This rate is fixed for at least the first five years after Modification."

57.    Item 34 of the NPV matrix indicated that the amortization period of the Loan was 268 months, or 22 years and 4 months.

58.    The effect of these two provisions in the Trial Modification was that the Scotts' total monthly principal and interest payments for the HAMP Modification offer was going to be $452.63 per month. Pursuant to the terms of the Matrix and the FAQ document (EXHIBIT E-4) this would be at, or very close to, the payment amount of the Permanent Modification for *at least five* (5) years.

59.    The exact language of the FAQ document, EXHIBIT E-4 was:

. . . Any difference between the amount of the Trial period payments and your regular mortgage payments will be added to the balance of your account along with any other past due amounts as permitted by your mortgage documents. While this

will increase the total amount that you owe, *it should not significantly change the amount of your modified mortgage payment* as that is determined based upon your gross monthly income, not your account balance." Emphasis added.

(EXHIBIT E-4).

60.     The Scotts accepted this Trial Modification offer with the reasonable reliance that the information included with the Trial Modification offer was reliable, true and correct. The Scotts complied with all the conditions outlined in the Trial Modification packet to assure they would get a Permanent Loan Modification that was approximately the same as the accepted Trial Modification.

61.      However, the SPS Permanent Loan Modification that was presented to the Scotts by letter dated July 15, 2015, was completely different from---and nearly 30% more expensive overall---than the Trial Modification offer and representations. EXHIBITS F-1, F-2 and F3).

62.     The Permanent Modification offer hiked the interest rate up to 8.625% from 2% and reduced the term of the modified Loan by about six years. The net effect of these two radical and unexplained changes was to increase the Scotts' principal and interest payment to $949.24, an increase of nearly $500 per month, more than twice the amount in the Trial Modification.

63.     The Scotts made numerous attempts to learn why the Permanent Loan Modification was so much higher than the Trial Modification but were consistently rebuffed, ignored, and/or stonewalled by the Defendant.

64.    After months of challenging this situation and seeking the assistance of the Consumer Financial Protection Bureau and local housing counselors, the Scotts were finally forced to consult with an attorney, and despite the difficulties it caused them, they began to pay the increased amount dictated by the Permanent Modification.

65.    However, after they resumed making their payments, SPS immediately insisted they make up the two payments that were missed while they challenged the Defendant to explain the new and much higher terms of the Permanent Modification. SPS has treated them as delinquent, or in default, and reported them as such to the three (3) major credit bureaus since that time.  (EXHIBIT K)

66.    The Trial Modification offer and accompanying information documents specified the terms of the prospective Permanent Modification agreement, comprised a firm and binding offer from SPS to the Scotts to enter into a binding contract. The only condition precedent for that Permanent Modification agreement was that the Scotts accept the offer and make the three required monthly payments under the Trial Modification. By the terms of the offer, the Permanent Loan Modification "should not significantly change the amount of your modified mortgage payment." Based upon these SPS representations, the Scotts complied with the sole material condition of making three timely monthly payments. However, SPS breached the agreement with the Scotts when it materially and unilaterally changed the Permanent Modification, effectively doubling the monthly interest and principal

21

payment.

67.     The cost to the Scotts of this SPS breach of contract has been over $6,000 to date, plus damage to their credit standing resulting from SPS improperly reporting them as 30 to 59 days past due. (EXHIBIT K)The damages to the Scotts, if they must pay the unlawfully increased principal and interest payment for the sixty (60) months of the promised term, (see Paragraph 52, above) will total $29,800.  Defendant's breach of contract is part of a continuing pattern and practice of violating the Scotts' federal and state rights.

## COUNT TWO
## PROMISSORY ESTOPPEL

68.     Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

69.     Plaintiffs specifically invoke the equitable powers of this Court and plead in the alternative to Count One as follows:

70.     Defendant clearly and unambiguously promised the Plaintiffs a Permanent Modification on terms materially the same as the terms of the Scotts' Trial Modification, so long as they complied with the conditional terms of the Trial Modification.  (EXHIBITS E-1, E-2, E-3, E-4)

71.     The Trial Modification offer and accompanying information documents specified the terms of the prospective Permanent Modification agreement, and taken together clearly and unambiguously stated a promise to the Scotts.   The only

22

condition precedent for keeping that promise was that the Scotts accept the Trial Modification offer and timely make the three required monthly payments.

72.     The Scotts reasonably relied on the promise made by SPS to their detriment by not seeking refinancing, a chapter 13 bankruptcy or other alternatives that would have been available to them.

73.     By the terms of the promise aforesaid, the Permanent Loan Modification "should not significantly change the amount of your modified mortgage payment." (EXHIBIT E-4) The Scotts relied upon the promise of being offered a roughly equivalent Permanent Modification and complied with the Trial Modification's terms and conditions to earn the promised Permanent Modification upon terms materially identical to the three payment Trial Modification.

74.     Given the extensive and consistent written documentation the Scotts received from Defendant comprising the Trial Modification offer, (EXHIBITS E-1, E-2, E-3, E-4) the Scotts' reliance upon the Defendant's promise was both reasonable and foreseeable to the Defendant.

75.     Based upon this SPS promise, the Scotts complied with the Trial Modification's condition of making three timely payments. However, SPS breached the promise to the Scotts when it materially and unilaterally changed the Permanent Modification effectively doubling the monthly interest and principal payment.

23

76.     The Permanent Modification offer (EXHIBITS F-1, F-2, F-3) significantly changed the terms of the Trial Modification and, as such, was a material breach of the Defendant's promise relied upon by the Plaintiffs.  The Scotts' suffered injury when SPS breached its promise because the non-compliant Permanent Modification increased their interest rate and decreased the term of the Loan thereby causing the Scotts' monthly principal and interest payment to double, all as set forth in Paragraphs 61 and 62 above.

77.     The cost to the Scotts of this SPS breach of promise has been over $6,000 in increased mortgage payments to date, plus damage to their credit standing resulting from SPS improperly reporting them as 30 to 59 days past due. (EXHIBIT K)  Further, the damages to the Scotts, if they must pay the unlawfully increased principal and interest payment for the sixty (60) months of the promised term, (see Paragraph 56, above) and will total $29,800 over five years and is part of a continuing pattern and practice of violating the Scotts' contract rights and their federal and state rights and entitles the Scotts to their actual damages, statutory damages and reasonable attorney fees and costs in pursuing their right of private action remedies under the newly promulgated RESPA and TILA Regulations as appears below.

## COUNTS THREE & FOUR

### WRONGFUL INFLATION OF ESCROW ACCOUNT LIABILITY VIOLATION OF 12 C.F.R. §1024.35(b)(11),  12 C.F.R. §1024.35(b)(5) and 12 C.F.R. §1024.17(c)(7)

78.     Plaintiffs restate and incorporate all of their statements and allegations

contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

79.    12 CFR §1024.17(c) says in relevant part:

(7) Servicer estimates of disbursement amounts. To conduct an escrow account analysis, the servicer shall estimate the amount of escrow account items to be disbursed. If the servicer knows the charge for an escrow item in the next computation year, then the servicer shall use that amount in estimating disbursement amounts. *If the charge is unknown to the servicer, the servicer may base the estimate on the preceding year's charge, or the preceding year's charge as modified by an amount not exceeding the most recent year's change in the national Consumer Price Index for all urban consumers (CPI, all items).* In cases of unassessed new construction, the servicer may base an estimate on the assessment of comparable residential property in the market area.  (Emphasis added)

80.    When SPS took over the Plaintiffs' mortgage servicing in October of 2014, they produced a projected initial escrow accounting that hiked the Plaintiffs' annual homeowners insurance up to $3,499.80 from an actual annual insurance premium, in March of 2014, of $902.96. (EXHIBITS J-1 and J-2) The initial SPS escrow analysis was produced on or about November 28, 2014 and was a wildly inflated number with no basis in reality.

81.    Nonetheless, as a result of this flawed "analysis" SPS unilaterally increased the Scotts' monthly mortgage payment by $301.12, effective January 1, 2015. In addition to the hiked escrow payment amount, the first SPS escrow analysis informed the Scotts that they now had an escrow shortage of $3,019.23. (EXHIBIT J-2) The initial escrow document informed the Scotts that they could pay the shortage in full, immediately, or elect to make 24 monthly payments of $125.80. The Scotts could not afford the payment in full, so adding $125.80 to the increase of $301.12

25

meant that the Scotts now had to cope with a monthly mortgage bill that was $425.92 higher than before SPS took over the servicing.

82.     When SPS did the initial escrow analysis they were limited by the new federal servicing regulations to keep the homeowners insurance amount where it was from the prior servicer, get an actual estimated cost for the following year or use the prior year's consumer price index to add 1.5% to the previous year's insurance premium. (12 CFR §1024.17(c)(7))

83.     On March 31, 2015 SPS sent out another escrow analysis (EXHIBIT J-3) that conceded the errors in the initial, November 2014 escrow analysis.  This analysis supposedly dropped the escrow total back down to $272.35 effective May 1, 2015. However, contradicting this unequivocal statement of the new, lower escrow amount, SPS did not drop the escrow payment to $272.35. (EXHIBIT J-4)

84.     Even though the March 31, 2015 escrow analysis indicated that the taxes and insurance portion of the payment each month (beginning in May of 2015) would drop to $272.35, in fact, the escrow portion somehow rose back to $487.67. (EXHIBIT J-4) No escrow analysis was done (or shared with the Scotts) to "rescind" the $272.35 escrow payment effective May 1, 2015. Plaintiffs have had their escrow account manipulated and artificially inflated ever since the Scotts' Loan was transferred to SPS for servicing.

85.     Notwithstanding this extreme error in handling the Scotts' escrow account, the Defendant failed to refund the wrongful overcharges to the Plaintiffs

claiming that the Scotts were in arrears on their monthly mortgage payments stemming from their still unresolved and still unexplained dispute concerning the hike in the principal and interest terms of the Permanent Modification.

## COUNT FIVE

## WRONGFUL PERMANENT LOAN MODIFICATION
## VIOLATION OF 12 C.F.R. §1024.35(b)(11)

86.    Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

87.    12 C.F.R. §1024.35(b)(11) provides in relevant part that:

(b) Scope of error resolution. For purposes of this section, the term "error" refers to the following categories of covered errors:

\* \* \* \* \*

(11) Any other error relating to the servicing of a borrower's mortgage Loan.

88.    When the Defendant increased the monthly payment on the Permanent Loan Modification from $452.63 to $949.24, it violated the procedures and guidelines of the United States Treasury's HAMP Tier 1 Loan Modification Program.  Moreover, so long as conditions were met by the Scotts in the Trial Modification, Defendant was bound to offer a Permanent Modification that complied with the provisions of the Making Homes Affordable Rules and Regulations as published by the United States Department of Treasury that required that the Permanent Modification be within the parameters of the NPV matrix. (EXHIBIT E-3)

89.     Notwithstanding the Defendant's repeated and vague insistence to the contrary, there is no regulatory nor program guideline that requires a mortgage servicer to spontaneously double the principal and interest payment from a Trial to a Permanent Modification.

90.     SPS's egregious conduct qualifies as an error under 12 C.F.R. §1024.35(b)(11) and entitles the Scotts to their actual damages, statutory damages, and reasonable attorney fees and costs in pursuing their right of private action remedies under the newly promulgated RESPA and TILA Regulations.

91.     The Scotts both suffered damages in the form of greatly increased payments, stress, anxiety, embarrassment, and humiliation resulting from Defendant's pattern and practice of ongoing misconduct and continuing refusal to honor the terms of the Trial Modification, all to their prejudice. Defendants paid over $6,000 more that should have been paid between the offer of the Permanent Modification and the present and are potentially on the hook to over-pay more than $23,000 more in the next four years.   Defendant's conduct related to its administration of this Loan Modification is part of a continuing pattern and practice of violating the Scotts' rights and entitles the Scotts to their actual damages, statutory damages and reasonable attorney fees and costs in pursuing their right of private action remedies under the newly promulgated RESPA and TILA Regulations.

## COUNT SIX

### PROVIDING NO OR MISLEADING INFORMATION
### ABOUT LOSS MITIGATION OPTIONS
### VIOLATIONS OF 12 C.F.R. §1024.35(b)(11) AND 12 C.F.R. §1024.41(d)

92.     Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

93.     SPS failed to provide accurate information to the Scotts (in fact, actively mislead the Scotts) regarding their loss mitigation options following the denial of the terms that should have been available to them under the Permanent Modification.

94.     12 C.F.R. §1024.41(d) provides:

> (d) Denial of Loan Modification options. If a borrower's complete loss mitigation application is denied for any Trial or Permanent Loan Modification option available to the borrower pursuant to paragraph (c) of this section, *a servicer shall state in the notice sent to the borrower pursuant to paragraph (c)(1)(ii) of this section the specific reason or reasons for the servicer's determination for each such Trial or Permanent Loan Modification option and, if applicable, that the borrower was not evaluated on other criteria.* (Emphasis added).

95.     SPS repeatedly failed and refused to disclose to the Scotts why it had chosen to withdraw the Trial Modification terms when by doing so it wrongfully and radically increased the monthly payment amount under the Permanent Loan Modification.

96.     SPS either misrepresented or did not respond to the Scotts' repeated requests for an explanation on August 7, 2015 (EXHIBIT H); on August 20, 2016 (EXHIBIT I); on January 14, 2016 (EXHIBIT S); April 21, 2016 (EXHIBIT Q) or on

April 22, 2016 (EXHIBIT R).

97.    The Scotts both suffered damages in the form of greatly increased payments, stress, anxiety, embarrassment, humiliation and marital stress resulting from Defendant's ongoing misconduct.

98.    SPS's egregious conduct here qualifies as an error under both 12 C.F.R. §1024.35(b)(11); and 12 C.F.R. §1024.41(d) and is part of a pattern and practice of Defendant's servicing misconduct that entitles the Scotts to their actual damages, statutory damages and reasonable attorney fees and costs in pursuing their right of private action remedies under the newly promulgated X and Z Regulations.

## COUNT SEVEN

### WRONGFUL DENIAL OF RIGHT TO APPEAL
### VIOLATIONS OF 12 C.F.R. §1024.35(b)(11) AND 12 C.F.R. §1024.41(h)(1)-(4)

99.    Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

100.    12 C.F.R. §1024.41(h) "Appeal process" provides:

(h) Appeal process. (1) Appeal process required for Loan Modification denials. If a servicer receives a complete loss mitigation application 90 days or more before a foreclosure sale or during the period set forth in paragraph (f) of this section, a servicer shall permit a borrower to appeal the servicer's determination to deny a borrower's loss mitigation application for any Trial or Permanent Loan Modification program available to the borrower.

(2) Deadlines. A servicer shall permit a borrower to make an appeal within 14   days after the servicer provides the offer of a loss mitigation option to the borrower        pursuant to paragraph (c)(1)(ii) of

this section.

(3)  Independent evaluation. An appeal shall be reviewed by different personnel than those responsible for evaluating the borrower's complete loss mitigation application.

(4) Appeal determination. Within 30 days of a borrower making an appeal, the servicer shall provide a notice to the borrower stating the servicer's determination of whether the servicer will offer the borrower a loss mitigation option based upon the appeal. A servicer may require that a borrower accept or reject an offer of a loss mitigation option after an appeal no earlier than 14 days after the servicer provides the notice to a borrower. A servicer's determination under this paragraph is not subject to any further appeal.

101.  On or about July 27, 2015, the Scotts spoke with a "relationship representative" ("Lisa") from SPS who, after being asked about the sudden change in basic terms on the Permanent Loan Modification, informed the Scotts that, "if we (the Scotts) appealed the Modification we would not get another.  And we could liquidate the house." (EXHIBIT G)

102.  When the SPS representative claimed that if the Scotts appealed the hiked rate on the Permanent Loan Modification offer, the Scotts would lose a chance for any Modification, SPS violated the right of the Scotts to an internal SPS appeal by separate SPS personnel than made the initial and baseless Permanent Loan Modification determination.

103.  The Scotts' right to an appeal of the loss mitigation determination by SPS is protected under 12 C.F.R. §1024.41(h). When the SPS "relationship representative" threatened the Scotts with consequences for exercising their appeal rights, it was a clear violation of 12 C.F.R. §1024.41(h). The Scotts suffered damages

31

in the form of greatly increased payments, stress, anxiety, embarrassment, and humiliation resulting from Defendant's ongoing misconduct.

104.   SPS's egregious conduct here qualifies as an error under both 12 C.F.R. §1024.35(b)(11) and 12 C.F.R. §1024.41(h) and is part of a continuing pattern and practice of violating the Scotts' rights and entitles the Scotts to their actual damages, statutory damages and reasonable attorney fees and costs in pursuing their right of private action remedies under the newly promulgated RESPA and TILA Regulations.

### VIOLATIONS OF THE TRUTH IN LENDING ACT, THE REAL ESTATE SETTLEMENT PROCEDURES ACT OPERATIVE FACTS

105.   Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

106.   After receiving the unexplained and greatly increased Permanent Loan Modification documents, the Plaintiffs sent a letter that served as a "Qualified Written Request" to SPS and to the Consumer Financial Protection Bureau. The Scotts sought, but did not receive an answer that addressed the radically different Permanent Loan Modification offered on July 15, 2015. Defendant's responses to their efforts were vague and overbearing and ultimately presented the Scotts with an ultimatum: take it or leave it.  (EXHIBITS H and I)

107.   During this period Mrs. Scott spoke on the phone with an SPS representative, and suggested to the representative that she might file under a mandatory appeal process to try to regain the lower terms from the Trial Modification. At that time, in utter disregard for the regulatory required appeal

process, the SPS staffer indicated that she could file an appeal but that the Scotts would not receive a better Modification offer, and then suggested that perhaps the Plaintiffs home should be "liquidated." EXHIBIT G

108.    On or about December 4, 2015 Plaintiffs, through counsel, sent a Request for Information (RFI) to the designated address provided by SPS to send such inquiries. (EXHIBIT L). The RFI was received by SPS on December 8, 2015. SPS acknowledged receipt of the RFI by letter dated December 10, 2015, and promised a response within 30 days of December 8, 2015.

109.    SPS responded to the Plaintiffs' RFI, by letter dated January 5, 2016. (EXHIBIT M). The Plaintiffs' RFI requested, *inter alia* specific and relevant information about the Scotts' mortgage account and the SPS documentation (if any) that supported the March 18, 2015 Trial Modification offer and then the radically different, July 15, 2015 Permanent Modification offer.

110.    The SPS response to the Plaintiff's RFI was largely irrelevant and non-responsive. Most crucially, the SPS response and enclosed documents utterly failed to address the clearly and repeatedly expressed concerns about the radically increased Permanent Modification monthly payment. However, the response did contain numerous un-requested documents and irrelevant information, such as copies of the Note, the Mortgage, a prior Modification with the previous servicer, and a transfer of servicing notice dated months before the disputed transactions. EXHIBIT M.

111.    The SPS January 5, 2016 response did not provide any of the requested

materials related to the March 18, 2015 Trial Modification nor the materially different July 15, 2015 Permanent Modification. Further, regarding the slanderous communication with the Scotts' own insurance broker, SPS provided no acceptable materials or narrative response whatsoever.

112.    However, as required by the RESPA regulations, SPS did offer that: "Mr. and Mrs. Scott may request and we will provide, at no charge, copies of the documents that we relied on in reaching our determination that no error occurred." EXHIBIT M

113.    Relying upon this representation (and the mandatory RESPA regulations to the same effect) on January 7, 2016, the Scotts sent an even more focused and explicit Request for Information that sought the documentary support for the detrimentally changed terms in the Permanent Modification. EXHIBIT N. This follow up RFI was received by SPS on or about January 12, 2016.

114.    Also, on January 7, 2016, Plaintiffs sent a Notice of Errors to SPS. The Notice of Errors concerned the Defendant's error in offering a very different and more expensive Permanent Modification than the initial Trial Modification. The second error concerned a threatening telephone exchange between Mrs. Joyce Scott and a representative of SPS wherein the Scotts were cautioned not to appeal the Permanent Modification because it would be withdrawn, and they would have their house "liquidated." EXHIBIT O.

115.    On or about April 13, 2016, The Scotts sent another Notice of Error to the Defendant that put SPS on notice of the company's continuing error in not

responding to specific documentary requests concerning the error in the Trial-Permanent Modification changes, and the lack of any response to previously sent Notices of Error.  (EXHIBIT P)

116.   On April 22, 2016, SPS sent a letter with multiple enclosures contending that it fulfilled its duty to produce the Dispute Resolution Documentation concerning the doubled principal and interest payments required by the Permanent Modification. (EXHIBIT R) However, as before, the materials that SPS enclosed provided nothing whatsoever to explain the increased payment terms imposed upon the Scotts by the Permanent Modification. Rather, SPS merely sent previously mailed materials, a response letter to the Scotts and the CFPB dated  August 7, 2015 that vaguely recited that, "SPS followed a highly regulated process in order to grant approval under the HAMP program and the review was conducted in accordance with all guidelines set by the United States Treasury for HAMP . . ." EXHIBIT H

117.  On or about April 21, 2016, SPS sent yet another non-response (EXHIBIT Q) that failed to address the Scotts' continuing challenge to obtain SPS documentation supporting the hiked Permanent Modification offer.  The Scotts' Notice of Error (April 13, 2016) recited in relevant part:

> The Borrowers, by and through the RFI, requested the "documents relied upon by the servicer in reaching its determination," to not offer the Permanent interest rate at 2% for at least five years as promised in its March 18, 2015 explanation of the HAMP Tier 1 Loan Modification.

EXHIBIT P.  However, the Defendant continued to take the position that, ". . . your

35

letter did not raise an issue with the servicing of your account. " (EXHIBIT Q).

## COUNTS EIGHT, NINE & TEN

### FAILURE TO TIMELY RESPOND TO
### REQUESTS FOR INFORMATION AND NOTICE OF ERRORS
### VIOLATIONS OF 12 C.F.R. §1024.35(b)(11); 12 C.F.R. §1024.36(d)(1); and
### 12 CFR 1024.35(e)(4)

118.    Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

119.    On or about January 7, 2016 Plaintiffs, through their counsel, sent a Request for Information (RFI) to SPS at the designated address for such inquiries. The RFI is attached as (EXHIBIT O). The Request for information invoked 12 CFR 1024.35(e)(4) which provides:

> (4)    Copies of documentation. A servicer shall provide to the borrower, at no charge, copies of documents and information relied upon by the servicer in making its determination that no error occurred within 15 days (excluding legal public holidays, Saturdays, and Sundays) of receiving the borrower's request for such documents. A servicer is not required to provide documents relied upon that constitute confidential, proprietary or privileged information. If a servicer withholds documents relied upon because it has determined that such documents constitute confidential, proprietary or privileged information, the servicer must notify the borrower of its determination in writing within 15 days (excluding legal public holidays, Saturdays, and Sundays) of receipt of the borrower's request for such documents.

120.    By letter dated January 14, 2016, SPS responded to the Plaintiffs' request for documents asserting, "Because your letter did not raise an issue with servicing of your account, we have directed your correspondence to the appropriate department for handling and we consider this matter closed." EXHIBIT S.

121.   SPS did not respond to the RFI for the documentary support of its decision to offer a more expensive Modification until April 22, 2016 (EXHIBIT R) thereby violating the thirty (30) business day timeliness provisions of 12 CFR §1024.35(e) which required a response to the document request by February 18, 2016. The April 22, 2016 response was 65 days past due under the regulations.

122.   When Defendant did respond by letter dated April 22, 2016, it failed to provide any paperwork relevant to the process that led SPS to the hike in the Permanent Modification principal and interest payment. Rather, SPS sent the same documents that had been produced before, none of which addressed the still unanswered questions about how and why the March 18, 2015  Trial Modification morphed into the radically different and more expensive July 15, 2015 Permanent Modification.

123.   SPS's egregious conduct in responding late and continuing to withhold relevant information or documents are part of a pattern and practice of violating the Scotts' rights and qualify as  errors under 12 C.F.R. §1024.35(b)(11); 12 CFR 1024.35(e)(4) and 12 C.F.R. §1024.36(d)(1). Defendant's conduct is part of a continuing pattern and practice of violating the Scotts' rights and entitles the Plaintiffs to their actual damages for each such violation, including their monetary damages, statutory damages and reasonable attorney fees and costs in pursuing their right of private action remedies under the newly promulgated RESPA and TILA Regulations.

## VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT
## 15 U.S.C. §1692a, et seq.

## BACKGROUND AND OPERATIVE FACTS

124.    Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

125.    Plaintiffs are "consumers" as defined by 15 U.S.C. §1692a(1) because they are natural persons obligated or allegedly obligated to pay the Loan on their personal, single family residence located at 3177 Ashwood Road, Cleveland, Ohio 44120.

126.    The Loan is a "debt", as defined by 15 U.S.C. §1692a(5). The debt that is the subject of this action arose for primarily personal, family, or household purposes because the Loan was obtained in connection with the Plaintiffs' personal residence.

127.    SPS is a "debt collector" as defined by 15 U.S.C. §1692a(6) because SPS regularly attempts to collect debts owed and asserted to be owed to another. In this matter, SPS is collecting debts asserted to be owed to Springleaf Financial Services, Inc. Further, at the time that SPS began servicing this Loan on behalf of Springleaf Financial Services, Inc., the Scotts' Loan was in default, as anticipated by  15 U.S.C. §1692a(6)(F)(iii) and therefore SPS is not exempted from the proscriptions of the Fair Debt Collection Practices Act.

128.    The acts of SPS in attempting to collect the debt at issue constitute violations of the FDCPA, including, but not limited to the following sections:

a) §1692c(b)—Communication with third parties without the prior consent of the consumer given directly to the debt collector;

b) §1692c(c)— Communication with the consumer after receiving a cease communication notice from the consumer;

c) §1692d—Engaging in any conduct the natural consequence of which is to harass, oppress, or abuse any person;

d) §1692e—Making any false, deceptive, or misleading representation or means in connection with the debt collection;

e) §1692e(2)—Misrepresenting the character, amount, or legal status of the alleged debt;

f) §1692e(4)—Misrepresenting that nonpayment of the alleged debt will result in the sale of property;

g) §1692e(5)—Threatening to take an action that cannot legally be taken or that is not intended to be taken;

h) §1692f—Engaging in any unfair or unconscionable means to collect or attempt to collect the alleged debt; and,

i) §1692f(1)—Engaging in an attempt to collect any amount not authorized by the agreement creating the debt or permitted by law.

## COUNTS ELEVEN, TWELVE & THIRTEEN

### IMPROPER COMMUNICATIONS WITH THE PLAINTIFFS
### VIOLATIONS of 15 U.S.C. §1692d and §1692c(c) and §1692f

129.    Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

130.    Plaintiffs, through counsel, informed the Defendant that SPS should not contact the Scotts personally because they are represented by counsel. The first written Notice was sent by certified mail on December 4, 2015 and was received by SPS on December 8, 2016. (EXHIBIT T) Thereafter, SPS continued to telephone the Scotts and make personal visits to the Scotts' home where they left door hangers. (see EXHIBITS T-1, T-2)

131.  Defendant's continuing efforts to instigate direct contact with the Plaintiffs (EXHIBITS T-1 and T-2) necessitated a second written notice to cease and desist communications sent by certified mail on June 5, 2016 and received by SPS on June 10, 2016. (EXHIBIT U)  However, SPS continued to attempt to make direct personal contact with the Scotts. EXHIBIT U-1

132.  In response to this continuing effort to contact the Scotts by SPS or its agents, the Scotts by and through counsel sent a third notice to cease and desist contacting the Scotts by letter dated October 19, 2016. (EXHIBIT V) Notwithstanding receiving the December 4, 2015,  June 5, 2016 and October 19, 2016 cease and desist letters, SPS continues to attempt to directly contact the Scotts in violation of the Fair Debt Collection Practices Act, 15 USC §§1692d and 1692c(c) and 1692f.

133.  The conduct of the Defendant has damaged and injured the Plaintiffs by causing them embarrassment, intimidation and emotional distress all to their actual continuing damage.

134.  Plaintiffs are entitled to statutory damages, actual damages, and attorney's fees and costs pursuant to 15 U.S.C. §1692k(a) for the continuing violations of the three  sections of the FDCPA:  15 U.S.C. §1692c(c)— Communication with the consumer after receiving a cease communication notice from the consumer; §15 U.S.C. 1692d—Engaging in any conduct the natural consequence of which is to harass, oppress, or abuse any person; and 15 U.S.C. §1692f—Engaging in any unfair or unconscionable means to collect or attempt to collect the alleged debt; above cited.

Further, Plaintiffs will be entitled to additional damages for each verified contact violation that occurred after December 8, 2015. Details of those ongoing contact efforts will develop as discovery proceeds in this matter.

### COUNTS FOURTEEN AND FIFTEEN

### MISREPRESENTING THE CHARACTER, AMOUNT, AND LEGAL STATUS OF THE ALLEGED DEBT AND COLLECTING AN AMOUNT NOT AUTHORIZED BY THE AGREEMENT CREATING THE DEBT VIOLATIONS of 15 U.S.C. §1692e(2) and §1692f(1)

135.   Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

136.   Since July 15, 2015 and continuing through to the filing of this Complaint, SPS has taken affirmative steps to misrepresent the escrow obligation of the Scotts and to collect upon an unlawful Loan Modification that wrongfully charges the Scotts an additional $500 per month on their Mortgage, all as is more fully alleged in Paragraphs 13 through 37 above.

137.   SPS continues to invoice the Scotts and send communications stating they are in default on their payments; further SPS continues to report the Scotts as 30 to 59 days behind in their mortgage payments to the three national Credit Reporting Agencies (EXHIBIT K) even though SPS wrongfully deprived the Scotts of their contract rights and the benefits and advantages inuring to them under the original Trial Modification Agreement.

138.   As a result of the Defendant's misconduct of overcharging and incorrectly

invoicing the Scotts on their escrow and principal and interest obligations they have been damaged, to date, in an amount exceeding $6,000.00 in principal and interest over-payments alone.

139.    The conduct of the Defendant has damaged and injured the Plaintiffs by causing them embarrassment, intimidation, emotional distress and marital distress in addition to their actual, over-payment damages. Further, the Scotts are entitled to statutory damages under the FDCPA for each and every month it has continued to wrongfully overcharge the Scotts. Plaintiffs are entitled to statutory damages, actual damages, and attorney's' fees and costs pursuant to 15 U.S.C. §1692k(a), for ongoing violations of 15 U.S.C.§1692e(2) — Misrepresenting the character, amount, or legal status of the alleged debt; and 15 USC §1692f(1)— Engaging in an attempt to collect any amount not authorized by the agreement creating the debt or permitted by law.

## COUNTS SIXTEEN AND SEVENTEEN

### DEFENDANT'S HARASSMENT OF THE PLAINTIFFS; DEFENDANT'S FALSE STATEMENTS IN ATTEMPTING TO COLLECT A DEBT; AND DEFENDANT'S THREATS TO SELL THE PLAINTIFFS' PROPERTY VIOLATIONS of 15 U.S.C. §1692d; §1692e and §1692e(4)

140.    Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

141.    When the Plaintiffs raised concerns about whether the SPS-offered Permanent Modification was correct, Mrs. Scott was told by an SPS representative ("Lisa") that any appeal of the decision would cause the Plaintiffs to lose the Permanent Modification and that, if the Scotts appealed, another Modification would

not be offered.  (EXHIBIT G) This statement was patently false and intended to intimidate the Plaintiffs' into accepting the improperly modified Permanent Modification.

142.   In that same conversation, Mrs. Scott was told that an alternative to accepting the disputed Modification would be for the Scotts to "liquidate" their home. (EXHIBIT G)

143.   SPS's representative's conduct and representations in that telephone call were false and improperly threatening, harassing, abusive, and oppressive to Plaintiffs. (EXHIBIT G)

144.   The wrongful conduct of the Defendant has damaged and injured the Plaintiffs by causing them to fear losing their home and embarrassment, intimidation and emotional distress in addition to their actual damages. Further, the Scotts are entitled to statutory damages under the FDCPA for the multiple misrepresentations made to Mrs. Scott.

145.   Plaintiffs were harmed when SPS attempted to collect a debt by and through the aforementioned FDCPA violations committed by Defendant, and the Plaintiffs are entitled to statutory damages, actual damages, and attorney's fees and costs pursuant to 15 U.S.C. §1692k(a) and  15 U.S.C.§1692d; 15 U.S.C. §1692e and 15 U.S.C. §1692e(4).

## COUNT EIGHTEEN
## OHIO CONSUMER SALES PRACTICES ACT CLAIMS

146. Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

147. Plaintiffs are "consumers" as that term is defined in R.C. §1345.01(D). Defendant, Specialized Portfolio Servicing, Inc., is a "supplier" as that term is defined in R.C. §1345.01(C) and R.C. §1345.091(A). Defendant SPS is engaged with the Plaintiffs in "consumer transactions" as that term is defined in R.C. §1345.01(A).

148. Defendant has materially misrepresented the nature of the alleged debt that Plaintiffs owed to Defendant's client, Springleaf Financial Services, Inc. SPS has misrepresented the amounts due for their escrowed taxes and insurance premium on their Loan and the legality of the hiked-up Permanent Modification to the Plaintiffs, and deprived the Scotts of the material benefits and advantages of the Trial Modification contract, all as alleged in detail above. Defendant's actions were committed with "knowledge" as that term is defined in R.C. §1345.01(E).

149. Defendant's conduct violated R.C. §1345.02(A):

"No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."

Defendant's ongoing misrepresentation about amounts due for escrow and the radically increased principal and interest payments under the Permanent

Modification is a violation under the provisions of the Ohio Consumer Sales Practices Act.

150.  Plaintiffs have suffered "actual economic damages" as a result of Defendant's violations of the OCSPA by being forced to overpay approximately $500 per month on their mortgage since October of 2015 and over-payments on their wrongfully inflated escrow account and are therefore entitled to treble damages and attorney fees as provided for in R.C. §1345.09(A), (B) and (F).

<u>COUNT NINETEEN</u>
<u>SLANDER</u>

151.  Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

152.  The oral communications to Independent Insurance Agency of Ohio by SPS personnel included false and defamatory statements about and concerning the Plaintiffs, their homeowner's insurance coverage and alleged mortgage delinquency, all as alleged in paragraph 39, above.

153.  The Defendant's statements were false and without any basis in fact, and made without privilege or for a legitimate business purpose and SPS knew or should have known the statements were false and defamatory and made without any privilege to do so.

154.  The false and defamatory statements were communicated to Independent Insurance Agency of Ohio without any legal basis, business purpose or

privilege required to communicate such matters with third parties.

155.    The false and defamatory statements were made with actual malice or with fault amounting to gross negligence, and as a part of the ongoing pattern and practices of violating the Scotts' legal rights.

156.    The false statements were defamatory *per se*, and caused the Plaintiffs special damages, including but not limited to, damage to their personal and individual reputations, embarrassment in dealing with their insurance representative, and has been part of the wrongful pattern and practices that have forced the Plaintiffs to obtain legal counsel, and incur other costs.

157.    SPS has defamed the Plaintiffs by slander, for which the Plaintiffs are entitled to actual damages, punitive damages and their attorney fees.

## COUNTS TWENTY AND TWENTY ONE:

## CONVERSION OF THE PLAINTIFFS' PRINCIPAL AND INTEREST OVERCHARGES AND INFLATED ESCROWED ACCOUNT

158.    Plaintiffs restate and incorporate all of their statements and allegations contained in the preceding paragraphs in their entirety, as if fully rewritten herein.

159.    As referenced above, SPS wrongfully failed and refused to extend the Trial Modification offer of March 18, 2015 into a Permanent Modification contract that SPS was contractually bound to offer to the Scotts. (See Paragraphs 13 -37, above).

160.   The Plaintiffs were deprived of their rights to participate in the advantageous terms of the Trial Modification contract offered and accepted in March of 2015, all as pleaded above. The Scotts have a property right to the contract they accepted, which contract SPS has refused to acknowledge or honor, notwithstanding repeated, due demands.

161.   SPS has unilaterally and wrongfully asserted control over the Trial Modification contract rights that Plaintiff's accepted, and by refusing to acknowledge or comply with the terms of that contract have converted the Scotts' contractual rights and over-payments to its own purposes all to the detriment of the Plaintiffs.

162.   SPS has accepted the Scotts' over-payments and wrongfully misapplied these funds as they were not consistent with the original, breached Trial Modification contract offered in March of 2015.

163.   These actions constitute a conversion of the Plaintiffs' contract rights and funds and has damaged the Plaintiffs by over $6,000 to date, deprived them of their funds and unjustly enriched SPS as they applied the over-payments to the mortgage account. The receipt and wrongful control of these funds by SPS was done willfully and with a direct intent and knowledge that the over-payments and SPS's misapplication of those over-payments would result in a direct and proximate harm to the Plaintiffs.

164.   As detailed in this Complaint (Paragraphs 79 through 84) the Defendant violated provisions of the new RESPA regulations for determining proper Escrow

47

charges when a Loan is transferred to a new Servicer. Defendant accepted the servicing of the Scotts' Loan on or about October 1, 2014. (EXHIBIT C) (12 CFR §1024.17(e))

165. When SPS conducted its initial escrow account analysis (EXHIBIT J) it inflated the projected annual escrow requirements raising the escrow monthly payments by over $300 even though there was no basis in fact or experience to hike the escrow payment to such a large degree. When Defendant conducted its initial escrow analysis it violated the express provisions of 12 CFR §1024.17(e) and 12 CFR 1027.17(c)(7).

166. Defendant's inflated escrow projection immediately caused the Scotts' escrow account to have a "shortage" of $3,019.23, wrongfully driving the Scotts even further behind on their Loan payments. This supposed shortage was contrived by the Defendant's violations of the expressions of 12 CFR 1027.17(c)(7) as alleged above in paragraphs 79 through 84,

167. Subsequently SPS reevaluated its mistaken overcharges on the Escrow account and projected a much reduced escrow payment beginning in May of 2015. However, notwithstanding this March 31, 2015 escrow re-analysis (EXHIBIT J-3) the Scotts' escrow payment, in fact, remained inflated for the rest of 2015. Plaintiffs have had their escrow account manipulated and artificially inflated ever since the Scotts' Loan was transferred to SPS for servicing.

168.   The Scotts' were entitled to have their escrow payments calculated and administered in accordance with the provisions of 12 CFR §1024.17 and the terms of the Plaintiffs' mortgage contract and the 2012 Loan Modification Agreement, Section 4. (EXHIBIT D) Defendant's failure to administer the Scotts' escrow account in compliance with their contractual and statutory rights and the Defendant's collection and refusal to return wrongfully charged escrow payments, converted the Scotts' property rights to a properly administered escrow account.  Further, by withholding the escrow account overpayments, Defendant SPS caused the Scotts monetary damages.

169.   As a direct and proximate result of SPS's actions and conversion of their escrow funds to its own use and benefit, the Plaintiffs suffered both economic and non-economic damages and are entitled to receive damages as in their contract claim; damage to their credit standing from continuously reporting the Scotts to credit reporting agencies as 30 to 59 days delinquent (EXHIBIT K); punitive damages for Defendant's  continuing pattern and practice of misconduct and to the Scotts' attorney fees incurred in pursuing litigation to recover their wrongfully converted property.

## CONCLUSION

170.   As a direct and proximate result of SPS's conduct and the distinct and ongoing violations above enumerated, Plaintiffs suffered continuing fear of losing their home, and actual damage in the form of wasted time, frustration, humiliation, exacerbated symptoms of physical ailments and emotional distress. The Plaintiffs

continue to live under the cloud of SPS's ongoing servicing errors and the ever present possibility and threat that they will wrongfully lose their home to foreclosure.

171.   The Plaintiffs were forced to incur additional attorney's fees and costs to prepare this suit and to mail Notices of Error and Requests for Information, and have suffered actual and statutory damages as a result of Defendant's continuing violations under applicable TILA and RESPA regulations.

## DEMAND FOR RELIEF

**WHEREFORE**, the Plaintiffs Thomas and Joyce Scott pray that this Court enter its order granting judgment in their favor against Select Portfolio Servicing for the following:

A. For their actual damages, costs, and reasonable attorney fees which are ongoing and subject to specificity after discovery is conducted and Defendant's wrongful conduct toward the Scotts ceases;

B. For statutory damages of up to $2,000.00 as to each count on their RESPA Claims;

C. For statutory damages of up to $2,000.00 or $4,000.00 for their TILA Claims;

D. For statutory damages and attorney fees and costs pursuant to 15 U.S.C. §1692k(a) of the FDCPA.

E. For actual economic damages, statutory and treble damages for violations of the Ohio Consumer sales Practices Act;

F. For their actual and punitive damages and attorney fees  incurred from the Defendant's Breach of Contract and/or Breach of Promissory Estoppel, Conversion, and Slander committed against them; and

G. Such other relief which this Court may deem just and equitable.

Respectfully submitted,

/s/ Marc E. Dann
Marc E. Dann (0039425)
Paul B. Bellamy (0005314)
Dan Solar (0085632)
Brian Flick (0081605)
THE DANN LAW FIRM CO., L.P.A.
P.O. Box 6031040
Cleveland, OH 44103
Phone: (216) 373-0539
Fax: (216) 373-0536
notices@dannlaw.com

## JURY DEMAND

Plaintiffs hereby request a Trial by Jury on all issues triable to a jury, with the maximum number of jurors permitted by law.

/s/ Marc E. Dann
Marc E. Dann (0039425)
Paul B. Bellamy (0005314)
Dan Solar (0085632)
Brian Flick (0081605)
THE DANN LAW FIRM CO., L.P.A.